John William Ward & others[1] *vs.* David B. Coletti.

Suffolk.  November 6, 1980. — March 5, 1981.

Present: Hennessey, C.J., Braucher, Kaplan, & Wilkins, JJ.

*Special Commission.  Investigating Body.  Witness,* Subpoena.  *Constitutional Law,* Fiscal year, Appropriation of money, Referendum. *Statute,* Effective date.  *Jurisdiction,* Superior Court.

Statute 1980, c. 257, which amended St. 1980, c. 145, § 2, an appropriation act supplemental to the general appropriation act for fiscal year 1980, by inserting an appropriation to the Department of the Attorney General for the expenses of an investigation and study by the Legislature's Special Commission Concerning State and County Buildings, the appropriation to expire on December 31, 1980, did not violate art. 63, § 3 and § 4, of the Amendments to the Massachusetts Constitution since c. 257 was related to the general appropriation act for fiscal 1980, even though the fund was available for disbursement through the first half of fiscal 1981, and since c. 257, by amending c. 145, § 2, indicated that the appropriation was to be from the general fund. [102-105]

Statute 1980, c. 257, which amended St. 1980, c. 145, § 2, by inserting an appropriation to the Department of the Attorney General for the expenses of an investigation and study by the Legislature's Special Commission Concerning State and County Buildings, was a law "which may not be made the subject of a referendum petition" within the meaning of art. 48 of the Amendments to the Constitution, The Referendum, I, and could, therefore, take effect before the expiration of ninety days after its enactment.  [105-108]

In an action by the members of the Special Commission Concerning State and County Buildings seeking an order to require the defendant to comply with its summons, there was no merit to the defendant's arguments that the Superior Court lacked subject matter jurisdiction, that the commission had wrongfully disclosed information about his refusal to testify, or that he was privileged to refuse to testify on the ground that any interrogation of him could not contribute to the task committed to the commission and therefore would amount to no more than aimless harassment.  [109-110]

[1] Francis X. Bellotti, Frances Burke, Peter Forbes, Daniel O. Mahoney, Walter J. McCarthy, and Lewis H. Weinstein, all as members of the Special Commission Concerning State and County Buildings.

CIVIL ACTION commenced in the Superior Court Department on July 30, 1980.

A judgment of contempt was entered by *Wagner, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*James R. DeGiacomo (Loring A. Cook, III, & Joel M. Sowalsky* with him) for the defendant.

*Michael G. Tracy (Susan S. Beck* with him) for the plaintiffs.

KAPLAN, J. In the course of carrying out its official tasks — recently described by us in *Ward* v. *Peabody*, 380 Mass. 805, 806-808 (1980) — the Legislature's Special Commission Concerning State and County Buildings on March 28, 1979, issued a summons to David B. Coletti, an officer of Coletti Brothers, Inc., a Hingham architectural firm which had received a number of contracts for the design and construction of public buildings. Appearing before the Commission on April 11, 1979, Coletti refused to answer questions or to produce documents in accordance with the summons and corresponding directions of the Commission. He claimed a privilege against self-incrimination. By order of the Commission the summons remained in force.

On June 12, 1980, the Commission authorized its counsel to file an application with this court (in the county of Suffolk) to grant Coletti immunity from prosecution with respect to the testimony he might give before the Commission. This procedure of applying for immunization was available by the terms of the Resolve creating the Commission. Such an application was duly filed and heard, with the result that on June 27, 1980, a single justice of this court entered an order granting Coletti the appropriate immunity. Coletti then initiated a proceeding in the Superior Court to enjoin the Commission from requiring his appearance and for declaratory relief. The proceeding failed; it is described in the margin.[2] Coletti appeared before the Commission on July 24 but refused testimony.

---

[2] The judge ruled on July 21, 1980, upon cross motions for judgment on the pleadings. His judgment denied the injunction prayed for and de-

On July 30, 1980, the members of the Commission, as plaintiffs (we shall refer to them collectively as the "Commission"), commenced the present action in the Superior Court against Coletti, as defendant, seeking an order that would require him to comply in full with the summons, the defendant now being under protection of the immunity. A judge of the Superior Court allowed the Commission's motion for judgment on the pleadings on August 28, 1980.[3] There was further disobedience before the Commission on September 8, 1980. Accordingly, on September 12, 1980, the Commission moved in the action for an order on the defendant to show cause why he should not be held in contempt. After hearing on September 26, 1980, the judge entered judgment of civil contempt against the defendant for knowing disobedience of the order of court of August 28, 1980. The judge denied the defendant's application for a stay pending appeal, and ordered him incarcerated until he should comply with the order of August 28, 1980, or until the life of the Commission should end on December 31, 1980 (or another date that might be enacted). A single justice of the Appeals Court denied the defendant's application for a stay, and a single justice of this court, to whom a similar application was made, continued it without action. But a panel of the Appeals Court, after hearing, on October 21, 1980, allowed a stay pending appeal, and arranged for expedition of the appeal in view of the approaching expiry of the Commission, *Ward* v. *Coletti,* 10 Mass. App. Ct. 629 (1980). We transferred the appeal here. Argument was heard on November 6, 1980, and, after consid-

clared that the Commission had had legal existence at all relevant times. Coletti failed on motions in the trial court and Appeals Court for an injunction pending appeal, and his appeal was dismissed per stipulation on September 15, 1980.

[3] The judge had denied previously the defendant's motion to dismiss the action for lack of subject matter jurisdiction. It will be enough to say that the issues arising on the motion for judgment on the pleadings, and discussed in this opinion, presented only questions of law. To some extent matters of record in the prior action (see n.2) were considered in ruling on the motion.

eration, we entered an order on November 13, 1980, affirming the judgment of civil contempt, vacating the stay, and remanding the case to the Superior Court for further proceedings. We promised an opinion or opinions to follow.

1. The defendant's main contention, the only one requiring any extended discussion, was that on August 28, 1980, when the order was entered requiring him to appear and testify, the Commission had no legal existence, hence the order failed, and with it the subsequent judgment of contempt from which the appeal was taken.

To an understanding of the argument, the constitutive legislation of the Commission must be mentioned. The Commission was set up by Resolves 1978, c. 5 and c. 9 (April 12 and June 16, 1978), in effect superseded by Resolves 1979, c. 11 (July 23, 1979). The latter fixed a termination date for the Commission of June 30, 1980, by specifying that that was the last date for the filing of its final report. See *Ward* v. *Peabody, supra* at 814-815. However the Legislature on June 9, 1980, voted, and the Governor on June 10, 1980, approved St. 1980, c. 257, "An Act relative to the appropriation and extension of time within which the special commission . . . shall make its final report." Section 1 of c. 257 amended St. 1980, c. 145, § 2 (approved May 15, 1980), an appropriation act supplemental to the general appropriation act for fiscal year 1980, ending June 30, 1980 (St. 1979, c. 393), by inserting an appropriation of $484,663 to the Department of the Attorney General for the expenses of an investigation and study by the Commission pursuant to its 1979 Resolve, this appropriation to expire on December 31, 1980. Section 2 of c. 257 struck out the expiration date of June 30, 1980, appearing in the 1979 Resolve and substituted December 31, 1980. Section 3 of c. 257 stated that the chapter should take effect upon its passage.

(a) *Budget amendment.* The defendant argues that the Commission was dead on midnight of June 30, 1980, because c. 257 was enacted in violation of art. 63, § 3 and § 4, of the Amendments to the Massachusetts Constitution (the

budget amendment) and therefore never took effect. The critical language of art. 63, § 3, is: "before final action on the general appropriation bill [the General Court] shall not enact any other appropriation bill except on recommendation of the governor."[4] Correspondingly, § 4 provides: "After final action on the general appropriation bill or on recommendation of the governor, special appropriation bills may be enacted. Such bills shall provide the specific means for defraying the appropriations therein contained." It is pointed out that the general appropriation bill for fiscal 1981 (July 1, 1980-June 30, 1981) was not approved until June 25, 1980 (St. 1980, c. 329), whereas St. 1980, c. 257, was approved, as already noted, on June 10, 1980.

The answer is that c. 257 was related to the general appropriation act, not for fiscal 1981, but for fiscal 1980, having been enacted expressly as an amendment to an act supplemental to the general appropriation act for fiscal 1980, and on a date before the close of fiscal 1980.

Chapter 257 appears on the same footing of validity as the supplemental act which it amends, unless it makes a difference that the fund appropriated for the Commission's work was available for disbursement not only in fiscal 1980 but also in the first half of fiscal 1981.

We do not think it makes a difference. *Opinion of the Justices,* 308 Mass. 601 (1941), is relevant. The situation put to the Justices was unusual. The Legislature planned a change of the State's fiscal period so that a gap would be created between the end of the old period (December 1, 1941-November 30, 1942) and the commencement of the

---

[4] Section 3 in full text is: "All appropriations based upon the budget to be paid from taxes or revenues shall be incorporated in a single bill which shall be called the general appropriation bill. The general court may increase, decrease, add or omit items in the budget. The general court may provide for its salaries, mileage, and expenses and for necessary expenditures in anticipation of appropriations, but before final action on the general appropriation bill it shall not enact any other appropriation bill except on recommendation of the governor. The governor may at any time recommend to the general court supplementary budgets which shall be subject to the same procedure as the original budget."

new (July 1, 1943). The Justices, in discussing how appropriation might be made for the interim period, expressed themselves in language more than ample to validate what was done in the present case, namely, a supplemental appropriation act, passed following the passage of, and in the same fiscal period as a general appropriation act, and authorizing disbursement in that period and also in the succeeding period.[5] See 3 Debates in the Massachusetts Constitutional Convention 1917-1918, at 1146-1148 (1920) (recognizing that appropriation could in some circumstances cover parts of two fiscal years).

The defendant expresses the fear that if supplemental bills such as c. 257 may be validly enacted, art. 63, § 3, would become defunct for practical purposes, and destroy the idea of a planned annual budget. We do not confront a situation of the evasive use of a supplemental appropriation act anticipating action on a general appropriation bill.[6] In the present case we have a general appropriation act which, like many others, is later found inadequate.[7] Among the

---

[5] The Justices said, 308 Mass. at 614-615: "Indeed, the language of art. 63 of the Amendments — as clearly was understood by the convention that approved it — recognizes that the general appropriation bill therein referred to cannot be finally acted upon until several weeks after the General Court has assembled, and that under the existing statute fixing the fiscal year such bill will include appropriations for a period before its passage. On the other hand, there is no restriction in the Constitution upon the appropriation of money to provide for expenditures to be made in the future even beyond the current calendar, political or fiscal year. . . .

"Irrespective of whether appropriations for a transitory period beyond the period included in the budget upon which the general appropriation bill is to be based may be added to the general appropriation bill by amendment (see, however, *Opinion of the Justices*, 294 Mass. 616, 621-622 [1936]), we are of opinion that the General Court is not precluded from making appropriations for the period beyond that covered by the original budget, upon supplementary budgets recommended by the Governor or by special appropriation bills."

(We are not concerned with any question of the amendment of a general appropriation bill, mentioned in the last-quoted passage.)

[6] We spoke adversely on a violation of art. 63, § 3, in *Opinion of the Justices*, 300 Mass. 630 (1938).

[7] There seems no doubt that a supplemental appropriation act may include items not mentioned in the Governor's initial budget proposal or in

objects for which appropriation is needed is one that will extend into the next fiscal year but is expected to have a terminus therein. It makes practical sense to deal with the fiscal requirement as a unit; and such was the case with c. 257. We add, as the Commission points out, that there are many examples in the past of supplemental appropriation acts resembling c. 257, that is, authorizing disbursements in the next, as well as the current, fiscal year to cover activities likely to end in that next year.[8] This repeated legislative practice is not without significance in interpreting the constitutional provision. See *Fitzgerald* v. *Selectmen of Braintree*, 296 Mass. 362, 367 (1937). Cf. *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 557 (1979).

Finally the defendant argues that if c. 257 otherwise met the budget requirements, it failed because it did not provide "the specific means for defraying" the appropriation made. But the statute was amendatory of St. 1980, c. 145, § 2, and this indicated the specific means, i.e., appropriation from the general fund. See *Commonwealth* v. *Howes*, 270 Mass. 69, 72 (1930); *Fitzgerald* v. *Lewis*, 164 Mass. 495, 499 (1895); 1A C. Sands, Sutherland Statutory Construction § 22.35 (4th ed. 1972). See also G. L. c. 29, § 16 (payments authorized by appropriation acts to be made from ordinary revenue if no other provision is expressly made).[9]

(b) *Referendum amendment.* Article 48 of the Amendments to the Constitution, The Referendum, I, "When Statutes shall take Effect," provides: "No law passed by the general court shall take effect earlier than ninety days after it has become a law, excepting laws declared to be emer-

---

the general appropriation act as passed. See *Opinion of the Justices*, 294 Mass. 616 (1936).

[8] For example, St. 1973, c. 319, Item 7416-9103 (moving college campus); St. 1976, c. 199, Item 7027-9051 (electrical improvements in State building); St. 1979, c. 342, Item 1102-3915 (renovation of State House).

[9] We need not evaluate the Commission's further argument that § 3 of the budget amendment was satisfied on the alternative ground that c. 257 was responsive to a Governor's message because it is related to St. 1980, c. 145, § 2, which was traceable to such a message.

gency laws and laws which may not be made the subject of a referendum petition, as herein provided." Article 48, The Referendum, III, Referendum Petitions, § 2, provides in part: "No law . . . that appropriates money for the current or ordinary expenses of the commonwealth or for any of its departments, boards, commissions or institutions shall be the subject of a referendum petition." Chapter 257 was not passed as an emergency measure, although the affirmative votes on the statute in each house exceeded two-thirds of those voting (House, 136 to zero; Senate, 38 to 1).[10] The question is whether c. 257 was of a kind not subject to referendum petition; if it was subject to such petition it could not take effect before ninety days had elapsed, and August 28, 1980, the date of the crucial order upon the defendant, fell short of the ninety days.

Chapter 257 appropriates money to "The Department of the Attorney General," and the money is destined to be expended on behalf of a "commission." We need not consider the weight of the defendant's arguments that the named department is merely a pass-through, and that a special commission is not the same as a commission in the constitutional sense. The parties dwell mainly on the elucidation of the language "the current or ordinary expenses of the commonwealth." The case of *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365 (1931), teaches that the expenses referred to in the quoted language are "the expenses of the Governor and Council and of officers serving directly under the Governor and Council, as well as expenses of the entire legislative and judicial departments of the government" (also denominated in the opinion "divisions of the activities of government"), as distinguished from the expenses of any of the departments, boards, commissions, or institutions.

---

[10] It is a condition of a measure being declared an emergency measure that there be a preamble to that effect separately approved by a two-thirds majority in each house, or a message from the Governor, filed with the Secretary of the Commonwealth, stating that a public necessity requires that the measure be effective immediately. See art. 48 of the Amendments, The Referendum, II.

*Id.* at 370. Expenses of the present Commission established by and reporting to the Legislature seem to us to be Commonwealth expenses within *Yont.*[11] And the expenses of this Commission appear "current" in the sense that the Commission was earlier established, had been in continuous operation up to the time the appropriation was enacted, and was to continue its operations for a period beyond; and the money appropriated could be used at once. The Commission was not a new creation to be newly funded. One does not readily associate legislation continuing an existing project for a short, stated period, with the purposes of, or occasions for, referendum petitions. In this view of "current," it is unnecessary to consider whether the expenses in question were "ordinary," although the frequency of delegations by the Legislature to its own committees, or to other bodies established by it, to investigate and report, may well justify calling these expenses by that name.[12]

The defendant observes that c. 257 did more than appropriate, it also extended the life of the Commission. The argument is that c. 257 was subject to referendum, if its nonappropriation purpose or content constituted its "main design." But as the appropriation was conterminous with and practically indispensable to the extension of the life of the Commission, the extension did not have a design separate from that of the appropriation which could fairly be called the main design of the statute: indeed, here a test of main design would seem not only hard to apply, but rather pointless. If the appropriation is a material part of c. 257,

---

[11] This seems clear from *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365 (1931), and on principle. The remarks in *Yont* about executive-administrative arrangements were made in the light of art. 66 of the Amendments, which required that those functions be organized in not more than twenty departments. Article 66 was superseded in 1966 by art. 87, which provides for a scheme of greater flexibility.

[12] The defendant refers to *Harvey* v. *Sudbury*, 350 Mass. 312, 315 (1966), where we interpreted a statute providing for acceptance of Federal funds and for their disbursement for "current expenditures" of a school system. The context was so different from that of the present case that the opinion has no relevance here.

as it is, we see no occasion for getting into the metaphysics of a discussion about whether that aspect was "main" or not "main."[13]  In the *Yont* case, *supra*, the court, holding that the appropriation there was to a "department" (the public works department) in the sense of "any of its [Commonwealth's] departments, boards, commissions or institutions," did not think it necessary to pause to consider whether the substantive provisions of the statute — an elaborate program looking to highway and other construction to provide jobs to counter unemployment — might not have represented the main design of the statute.  The court did not use such a criterion.[14]  The Commission points, correctly, to instances of acts comprising both appropriations and substantive provisions which were stated to be effective upon passage (or earlier) without an emergency preamble or message from the Governor.[15]  See also Rep. A.G., Pub. Doc. No. 12, at 314 (1966).

We conclude that c. 257 meets objections based on the Amendments to the Constitution concerning budget and referendum.  Besides complying with the procedures prescribed by these articles, it was consistent with their intrinsic policies.

---

[13] The defendant seeks to import a criterion of "main design" or "chief thrust" (*Horton* v. *Attorney Gen.*, 269 Mass. 503, 511 [1929]; *Commonwealth* v. *Yee*, 361 Mass. 533, 537 [1972]) from situations where some legislation has been claimed to "relate" to the "powers, creation or abolition of courts" and thus to be excluded from initiative petition (art. 48, The Initiative, II, Initiative Petitions, § 2) or referendum.  In the cited cases, laws, respectively, about the establishment of a State motor vehicle insurance fund, and about narcotics, were held not to relate to the "powers" of courts although they would appear in the courts for enforcement.

[14] The court said in *Yont*, 275 Mass. at 369: "The argument that the interpretation here set forth will enable the General Court to nullify the effect of art. 48 of the Amendments by tacking to any law an appropriation for a department cannot override the plain meaning of the pertinent words of the Amendment.  Moreover, it cannot be presumed that the legislative department of the government will be actuated by unworthy motives or enact laws as a cover for ulterior aims."

[15] Statutes 1979, c. 765 and c. 799.

2.  Other matters mentioned by the defendant need not long detain us.  He says that it follows from the fact that the Commission's application for procuring his immunity was brought in this court for the county of Suffolk, that the Commission's action for an order compelling him to appear and testify should have been brought in the same court, not in the Superior Court.  This is pure non sequitur, and the judge of the Superior Court properly denied the defendant's motion to dismiss the action for want of subject matter jurisdiction.  Nothing is pointed to that excludes the jurisdiction of the Superior Court; indeed the 1979 Resolve affirms it.[16] After immunization in the county court of witnesses appearing before grand juries (see G. L. c. 233, §§ 20C-20I), proceedings to compel their testimony can be and have been brought in the Superior Court, see *Commonwealth* v. *Santaniello*, 369 Mass. 606 (1976); and so here as to Superior Court jurisdiction.  Indeed, when the defendant attempted to enjoin the Commission from compelling his appearance and testimony, he brought his action in the Superior Court.

The defendant argues, pointing to the appearance of a newspaper article (set out in his answer) about his refusal to testify before the Commission, that there must have been a leakage of information for which the Commission must have been responsible (the hearings at which the defendant appeared were private, as authorized by the Resolve). Then he cites decisions which have said that indictments may be quashed or grand jury proceedings suspended for gross violations of secrecy by the government.  See *Commonwealth* v. *Harris*, 231 Mass. 584 (1919), and, generally, *In re Grand Jury Investigation*, 610 F.2d 202, 213-221 (5th Cir. 1980).  Without speculating on what would be an

---

[16] That Resolve states:  "Any justice of the supreme judicial court or of the superior court may upon application by the commission compel the attendance of witnesses summoned as aforesaid [procedure for issuance of summons by Commission], the giving of testimony under oath and the production of books and papers before the commission in furtherance of any investigation under this resolve in the same manner and to the same extent as before the supreme judicial or superior courts."

appropriate remedy if the Commission were guilty of a wrongful disclosure of information, we may say that we agree with the judge below in his ruling as a matter of law that the newspaper report was innocuous on the whole, and could not support the load of innuendo and indignation that the defendant sought to pile on it. See *In re Special April 1977 Grand Jury*, 587 F.2d 889, 892 (7th Cir. 1978).

Finally, the defendant claims a privilege to refuse testimony on the ground — not related to self-incrimination — that any interrogation of him could not contribute to the task committed to the Commission by the Legislature and therefore would amount to no more than aimless harassment. We spoke in *Ward* v. *Peabody*, 380 Mass. 805, 819-820 (1980), of limits on the interrogation of witnesses by this and like investigative commissions in the interests of preserving a decent privacy or civility. But here the defendant presented no case in adequate detail for testing those boundaries; he refused substantially all testimony before the Commission. Such obduracy the defendant could not excuse, and he was properly adjudged in contempt.